## 25309. CITY OF ATLANTA *v.* LANDERS.

Decided July 11, 1936.

*J. C. Savage, C. S. Winn, Bond Almand,* for plaintiff in error.
*George & John L. Westmoreland, H. R. Lee, Alexander Bush,* contra.

Broyles, C. J. L. R. Landers brought a joint action for damages for personal injuries against the City of Atlanta and the Georgia Power Company. On the trial a nonsuit was granted as to the Georgia Power Company, and the case proceeded to a verdict and judgment against the city. Subsequently its motion for new trial was overruled, and the case was brought to this court.

We think the case is controlled, in part at least, by the decision of this court in *Butler* v. *Atlanta,* 47 *Ga. App.* 341 (170 S. E. 539), where the circumstances, including the weather conditions, were almost identical with those of this case. In that case a joint suit was brought against the City of Atlanta and the Georgia Power Company, for damages for personal injuries received by the plaintiff in driving an automobile at night against a safety

zone made of concrete, and about a foot high, which adjoined the power company's railway. The zone was not lighted, and could not be seen by the plaintiff on account of fog and darkness. This court said: "By statute . . the municipality and street-railroad companies operating within its limits have the power, without being guilty of maintaining a nuisance or committing thereby an act of negligence per se, to authorize the construction and maintenance of, and to construct and maintain under such municipal authority, what are termed 'safety islands' or 'safety zones' in streets at the side of a street-car line, for the use and safety of the public from automobile and other traffic when entering and departing from street-cars. Such zones have been generally recognized by the courts of other jurisdictions as a safety device of well-known efficiency for the protection of pedestrians and the reduction of casualties, the purpose of which is not to obstruct the thoroughfares, but to render them safer for travel." See also *Burd* v. *Atlanta,* 52 *Ga. App.* 681 (184 S. E. 412). Burd alleged that he, a stranger, was driving along Butler Street at night when it was raining very hard, and it was difficult to see in front of the automobile he was driving; that his headlights were burning, and he was going at the rate of 20 to 25 miles an hour; that there had been erected in the center of and across Butler Street a railroad bridge or trestle supported by and resting on foundations of steel and concrete with their base on Butler Street; that there were three of these supports, one on each side and one in the center of Butler Street, each about two feet wide at the base; that Butler Street was about 30 feet wide; that the foundation or supports of the bridge were dark or dull in color and had no light or device which could shine or show in the dark or constitute a warning of any kind; that he did not see the center support of the bridge until he was within 6 or 8 feet of it, and ran his automobile against it, sustaining the injuries for which he sued. He alleged that the city was negligent in failing to keep the street safe for travel, in failing to have the support lighted, and in allowing the alleged dangerous condition to continue, it having existed for a period of years and the city having notice thereof. The court dismissed the action on general demurrer.

This court affirmed that judgment, and said: "It appears from the petition that although the plaintiff was a stranger and

not familiar with the street, and although it was dark and raining so hard that the plaintiff could not see more than 6 or 8 feet ahead, he was driving at a speed of 20 to 25 miles an hour. It also appears that the plaintiff's automobile had lights that showed the way only 6 or 8 feet ahead, while the law requires that 'the front lamps shall throw light to a reasonable distance in the direction in which such vehicle is proceeding.' Code of 1933, § 68-302. The petition shows that the support against which the plaintiff collided was not a *temporary* obstruction left unlighted, but a *permanent* improvement used by the public for a number of years, and put there for the benefit of the public to save them from crossing a railroad-track, which always has a certain element of danger. The alleged dangerous condition was nothing more than an underpass such as is often seen and used by the public on streets and highways where they intersect railroads, and it constitutes a safer means of travel than crossing on the same level with the railroad tracks. The passageway on each side of the center support was approximately 15 feet wide, which was ample width for an automobile to travel, and constituted all of the street at that point. What the plaintiff did in this instance was to deviate from the prescribed and regularly constituted street and collide with an obstruction on the side thereof. The fact that the underpass was put there and maintained without lights at night would not create a liability of the city; it having been put there for the benefit, convenience and safety of the public, and being a permanent structure in the nature of an improvement. Telephone poles and water plugs on streets and sidewalks are not lighted at night, and yet they are obstructions which could result in injury, but the general welfare of the public necessitates them. 'Permanent structures which do not interfere with travel and which are erected for public purposes, such as telegraph and telephone poles, and the like, are permissible.' *City Council of Augusta* v. *Reynolds,* 122 *Ga.* 754 (50 S. E. 998, 69 L. R. A. 564, 106 Am. St. R. 147). The structure in the instant case was permanent, erected for public purposes, and did not interfere with travel, but actually facilitated travel. The support of the underpass leaves ample room for travel, and 'does not constitute an unreasonable interference with the lawful use of the street.' *South Georgia Power Co.* v. *Smith,* 42 *Ga. App.*

100 (155 S. E. 80). No sudden emergency confronted the plaintiff which caused him to turn from the duly-constituted travelway and collide with the support of the underpass. He was traveling between 20 and 25 miles an hour, in a city, over a street with which he was not familiar, in the dark, while it 'was raining very hard,' and when he could not see more than 6 or 8 feet ahead of him. In the language of the trial judge, 'the court is constrained to hold that the plaintiff's injuries were the result of his own negligence, and that he would not have been injured except for such negligence on his part. Any other ruling would place an unreasonably heavy burden upon the city.' The court did not err in sustaining the general demurrer and dismissing the action."

In the instant case, as in the *Butler* and *Burd* cases, it must be kept in mind that no dangerous defect or obstruction in the street of the city was involved, as it was in practically every case cited by counsel for the defendant in error. The undisputed evidence, including that of the defendant in error, shows that the safety zone was a permanent and substantial construction built of concrete, located near the middle of the street in a congested area of the city, for the safety of pedestrians and for the expedition of traffic. The safety zone was about 40 feet long, 4 feet wide, and 12 inches above the level of the street, and was located on Peachtree Street in front of the Henry Grady Hotel and immediately south of Cain Street. It had been there for about a year and a half. The testimony shows that the zone was usually lighted at night, but that it was unlighted on the night when the plaintiff drove his taxi-automobile against it, and had not been lighted for about a week previously thereto. The defendant in error, testified that he had not driven by the zone at night when it was unlighted until the night of the accident; but he also testified that he had often driven by it at night for about 18 months, and that he knew of its location, and that on the night in question *"I knew about the safety zone being along there. When I come along there that night I knew it was in there. I knew about where the safety zone was at. I had a pretty good idea."* (Italics ours.) He further testified that on that night he was driving a passenger northward on Peachtree Street, and that after crossing Ellis Street (the side street immediately south of the safety

zone), and while he was approaching the zone and was about 100 feet from it, and traveling at the rate of 20 miles an hour, a pedestrian stepped from the sidewalk on the east side of Peachtree Street and dashed across the street in front of him, and to avoid striking this person he swerved his car to the left and continued driving his car in the middle of the street, at a reduced speed, until he knew he had passed the pedestrian and until he was about 20 feet from the zone, and he *then saw it had no light on it,* and he swerved to the right and ran his car against the zone and caused his injuries. He testified that it was raining and foggy, and that under such weather conditions the lights on his car were inadequate for him to see the zone until he was 20 feet from it. While there was evidence that the zone on the night in question had a "reflector" on it, which was an adequate substitute for lights, this evidence was contradicted by other evidence; and the jury were authorized to find that the zone was unlighted and without a reflector. But under the ruling in the *Butler* and *Burd* cases, supra, and the decisions cited therein, it is doubtful whether the city was under the duty of maintaining lights on the zone.

However, conceding (but not deciding) that the city had such a duty, the evidence, including the testimony of the defendant in error, demanded a finding that by the exercise of ordinary care, after he became aware of the fact that the zone was without lights, he could have avoided being injured. This is apparent from his testimony when we consider the facts stated therein, and omit his unauthorized conclusions therefrom. He testified that he was driving on a dark, rainy, and foggy night, and that because of such weather conditions the lights on his cab were inadequate to see the zone until he was 20 feet from it. He admitted that for about a year and a half he had been driving his taxicab at night by this safety zone; that the zone was usually lighted up; that when so lighted it could be seen from a considerable distance; that when he drove toward it on the night of the accident he was proceeding at the rate of 20 miles an hour when he was 100 feet from it; that it was raining and was foggy; that the lights on his car, which were in good condition, were almost useless to him; that when he was within 100 feet of the safety device a man suddenly ran across the street in front of him, and he swerved his

car to the left to avoid hitting him, and continued driving, in about the center of the street, toward the safety zone; that he had reduced his speed when he was 20 feet from the zone, and *then saw and knew that no lights of any kind were on it.* What did he then do to avoid being injured? What would an ordinarily prudent man have done under the circumstances? Would he not have put on his brakes and stopped, or attempted to stop, his car before it reached the zone? If he had reduced his speed from 20 miles an hour, as he testified, why could not he have stopped his car within 20 feet if he had promptly applied his brakes? Furthermore, he testified that when he was 20 feet from the zone, and saw that it was unlighted, he swerved his car to the *right* and ran against the zone. It follows, as a logical deduction from this testimony, that before he swerved his car to the *right,* he was driving on that portion of the street which was to the *left* of the zone; and that if, instead of swerving to the *right,* he 'had merely continued driving to the *left* of the zone, he would have passed by it without striking it. In his testimony he gives no reason why, after seeing that the zone was unlighted, he turned to the right and ran against it. According to his testimony, properly construed most strongly against him (he being a party to the case), he did not put on his brakes or attempt in any way to stop his cab when he was 20 feet from the zone and traveling at a speed less than 20 miles an hour. Nor did he continue driving to the left of the zone, but "without rhyme or reason" he swerved his cab to the right and ran against the zone which was then plainly in his view. Instead of acting as an ordinarily prudent man would have done, he acted like a man bereft of his senses, and adopted the only course which prevented him from escaping injury in his dangerous situation. In our opinion the verdict in his favor was contrary to law and the evidence, and the court erred in refusing to grant a new trial.

*Judgment reversed. MacIntyre, J., concurs. Guerry, J., dissents.*

GUERRY, J., dissenting. I do not think the evidence shows that the plaintiff saw the safety zone before he hit it, but on the contrary it shows he did not see it until he struck it. I do not think this court can say, as a matter of law, that the proved facts showed that the plaintiff was so negligent and so lacking in ordinary care that a verdict for the defendant was demanded.